IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| VIRGINIA S. and MILTON M., on behalf of their minor daughter, RACHAEL M., | ) ) ) | CIVIL NO.  06-00128 JMS/LEK |
| | ) | |
| Plaintiffs, | ) ) | ORDER AFFIRMING IN PART AND REVERSING AND REMANDING IN |
| vs. | ) ) | PART ADMINISTRATIVE HEARING DECISION |
| DEPARTMENT OF EDUCATION, STATE OF HAWAII, | ) ) | |
| | ) | |
| Defendant. | ) ) | |
| _____ | ) | |

ORDER AFFIRMING IN PART AND REVERSING AND REMANDING IN
PART ADMINISTRATIVE HEARING DECISION

I.  INTRODUCTION

Plaintiffs Virginia S. and Milton M., on behalf of their minor

daughter Rachael M. ("Plaintiffs" or "parents"), seek reversal of the

Administrative Hearings Officer's Findings of Fact, Conclusions of Law and

Decision ("Decision") regarding the education of Rachael.  The Decision, issued

January 30, 2006, dismissed Plaintiffs' due process hearing request and concluded

that the Defendant Department of Education, State of Hawaii ("Defendant" or

"DOE") provided Rachael with a Free Appropriate Public Education ("FAPE").

The Plaintiffs appeal this ruling, arguing that the Individualized Education Plan

("IEP") offered by the DOE did not satisfy the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., and that material procedural

violations of the IDEA require reversal of the Decision.  The Plaintiffs also

challenge the Hearings Officer's November 30, 2005 Order ("Order"), which

granted Defendant's Motion to Dismiss with regard to Plaintiffs' request for

reimbursement for the 2003-2004 and 2004-2005 school years.

Based on the following, the court AFFIRMS the Decision issued

January 30, 2006 and REVERSES and REMANDS to the Hearings Officer the

Order issued November 30, 2005.

## II.  BACKGROUND

A.    Legal Background:  The IDEA

> In 1975, Congress passed what is now known as the
> Individuals with Disabilities Education Act ("IDEA"), 20
> U.S.C. § 1400 *et seq*., in response to a finding that more than
> half of the nation's eight million children with disabilities were
> not receiving appropriate educational services.  *Porter v. Board
> of Trustees of Manhattan Beach*, 307 F.3d 1064, 1066 (9th Cir.
> 2002).  Pursuant to the act, known then as the Education of All
> Handicapped Children Act ("EHA"), Congress appropriated
> federal funds for state special education programs and made
> them available on the condition that states implement policies
> assuring for all children with disabilities a "free appropriate
> public education," or "FAPE."  *Id.*; 20 U.S.C. § 1412(a)
> (establishing right to a free appropriate public education).

*Melodee H. v. Dep't of Educ.*, 374 F. Supp. 2d 886, 890-91 (D. Haw. 2005).  *See also Poolaw v. Bishop*, 67 F.3d 830, 834 (9th Cir. 1995) ("The IDEA's broad mandate to provide handicapped children with a free appropriate public education designed to meet the unique needs of each handicapped child is fairly imprecise in its mechanics.  This vagueness reflects Congress' clear intent to leave educational policy making to state and local education officials.").

FAPE ("free appropriate public education") is defined in 20 U.S.C. § 1401(9) as:

> special education[1] and related services that--
> (A)    have been provided at public expense, under public supervision and direction, and without charge;
> (B)    meet the standards of the State educational agency;
> (C)    include an appropriate preschool, elementary, or secondary education in the State involved; and
> (D)    are provided in conformity with the individualized education program required under section 1414(d) of this title.

---

[1]  "Special education" is currently defined in 20 U.S.C. § 1401(29) as follows:

> The term "special education" means specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including--
>
> **(A)**    instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
>
> **(B)**    instruction in physical education.

This definition became effective on July 1, 2005.  Prior to this date, the initial paragraph referred to "specifically designed instruction," rather than "specially designed instruction."

3

The FAPE to which a disabled child is entitled under the IDEA is not the absolute best or "potential-maximizing" education. *Bd. of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 197 n.21 (1982). Instead, states are obligated to provide a basic floor of opportunity through a program individually designed to provide educational benefits to the disabled child. *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d 1493, 1498 (9th Cir. 1996); *Ash v. Lake Oswego Sch. Dist.*, 980 F.2d 585, 587 (9th Cir. 1992). The "basic floor of opportunity" provided by the IDEA consists of access to specialized instruction and related services. *Seattle Sch. Dist., No. 1*, 82 F.3d at 1500 (*quoting Rowley*, 458 U.S. at 201). The basic floor, however, is more than merely providing a program that produces some minimal academic advancement. *See Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001) (*quoting Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 636 (4th Cir. 1985) ("Congress did not intend that a school system could discharge its duty . . . by providing a program that produces some minimal academic advancement, no matter how trivial.").

The FAPE required by the IDEA must be tailored to the unique needs of the disabled child by means of an "IEP." *Rowley*, 458 U.S. at 181; *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993). An IEP, or Individualized Education Plan, is "a written statement for each child with a

disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title."  20 U.S.C. § 1401(11).  *See* 20 U.S.C. § 1414(d)(1)(A) (setting forth specific requirements of IEP); *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1461 (9th Cir. 1996) ("Crafted annually by the child's teacher, her parents, a representative of the school district, and, where appropriate, the child, the IEP ensures that the child's education is tailored to her individual needs.").

Additionally, the IDEA requires states to develop procedures to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a FAPE.  20 U.S.C. § 1415(a).  These procedures include an opportunity to present complaints relating to the identification, evaluation, or educational placement of a child, as well as an opportunity to contest the school district's contention that it has provided a FAPE to that child.  20 U.S.C. § 1415(b)(6).  When a complaint is made pursuant to § 1415(b)(6), "the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing."  20 U.S.C. § 1415(f)(1)(A).  The burden of proof in an administrative hearing challenging an IEP is placed upon the party seeking relief.  *Schaffer v. Weast*, 126

S. Ct. 528, 537 (2005).  An aggrieved party can thereafter appeal the hearing

officer's determination to a federal district court.  20 U.S.C. § 1415(i)(2)(A).

In *Rowley*, the Supreme Court held that a court's inquiry is twofold:

"First, has the State complied with the procedures set forth in the Act?  And

second, is the individualized educational program developed through the Act's

procedures reasonably calculated to enable the child to receive educational

benefits?"  *Rowley*, 458 U.S. at 206-07 (footnotes omitted).  In the Ninth Circuit,

the procedural prong of *Rowley* is treated "as having two sub-parts:  First, was

there a procedural violation of the IDEA, and second, if there was error, did it

affect the substantive rights of the plaintiff."  *M.L. v. Federal Way Sch. Dist.*, 394

F.3d 634, 652 (9th Cir. 2005) (Gould, J., concurring in part and concurring in the

judgment).  Procedural error "constitutes the denial of FAPE only when it results

in lost educational opportunity for the child, or when it significantly restricts

parental participation in the IEP formation."  *Id.* at 653.

B.     Factual Background:  Rachael M.

**1.     The IEP**

Rachael M. is seventeen years old (born 4/25/89) and has been

eligible since elementary school for special education services under the IDEA.

*See* Decision, Administrative Record on Appeal ("ARA") Doc. # 14 at 165.  The

DOE developed an IEP for her and she received services until sixth grade (the 2001-2002 school year).  Her parents rejected the 2001 IEP and placed her at Malamalama Waldorf school for the 2001-2002, 2002-2003 and 2003-2004 school years.  Plaintiffs claim that the DOE did not hold IEP meetings after the 2001 IEP offer.[2]

Rachael began high school at Brehm Preparatory Academy ("Brehm") in Carbondale, Illinois, and has attended since the 2004-2005 school year.  In spring 2005, Rachael's parents contacted the DOE (via Hilo High School) about Rachael returning to Hawaii.[3]  According to Plaintiffs, prior to preparing the 2005 IEP for Rachael, the DOE rejected a request for Extended School Year ("ESY") services for the 2005 summer school session.  On June 23, 2005, Rachael's mother sent reports, evaluations and other information from Brehm to Hilo High for the school's consideration.[4]  Decision, ARA Doc. # 14 at 166.  Around this same time,

_____

[2] According to Plaintiffs' Opening Brief, the DOE did not hold any IEP meetings or perform evaluations for Rachael during the 2002-2003, 2003-2004 and 2004-2005 school years.  Rachael's mother testified that she did not recall DOE contacting her at any time from September 2001 until she contacted the DOE in April 2005.  Transcript ("Tr."), Vol. II at 103.

[3] Plaintiffs claim that at this time, Mother requested a copy of Rachael's confidential file on several occasions, but was eventually told that the file was lost.

[4] The information included:  Brehm's 2004-2005 IEP, Rachael's final grades for the 2004-2005 school year, Brehm's progress reports for the 1st-4th quarters, Toni-3 Test of Nonverbal Intelligence (taken August 24, 2004), Compuscore Version 1.1b Summary and Score Report (taken August 26, 2004), Woodcock-Johnson ("WJ") III Compuscore and Profile Program

(continued...)

Plaintiffs sent a deposit to Brehm for the 2005-2006 school year and made reservations to travel there at the start of the school year.[5]

The DOE held a Student Support meeting on July 13, 2005, at which time the participants proposed assessments for determining IDEA eligibility[6] and for developing an IEP if Rachael were found eligible.  Among others, Rachael's parents, a family friend, a regular teacher, and a special education teacher from Hilo High School attended this meeting.  Notes from the meeting indicate that "August 28th would be the last day student would be on the island per mother. Mother requested Private School Participation Project information be mailed to her[.]"  ARA Doc. # 15,  Petitioners' Exhibits ("PE") at 028.  An eligibility meeting was then held on August 10, 2005, attended by the parents, Jodi Ferreira

---

[4] (...continued)
Version 1.1 b. Age Band Profile -- Cognitive, WJ III Compuscore and Profile Program Version 1.1 b. Standard Score/Percentile Rank Profiles, Summary and Score Report WJ III (tested March 30, 2005), Brehm Residential Student Assessment from 2004-2005, Advisement Communication Forms and a speech/language assessment from Rainbow Services (from August 2004).  Decision, ARA Doc. # 14 at 166.

[5] Plaintiffs paid $46,600 to Brehm for Rachael's 2005-2006 tuition on June 24, 2005.  Tr. Vol. II at 92.  They also spent approximately $3,000 on related travel reservations.

[6] Based on the present levels of educational performance ("PLEPs") portion of the IEP, it appears Rachael was administered the Kaufman Test of Educational Achievement (on July 15, 2005), the Wechsler Abbreviative Scale of Intelligence (on July 26, 2005), and was given a psychological assessment by Dr. Joe Bratton (on July 26, 2005).  ARA Doc. # 16, Respondent's Exhibits ("RE") at RM 21-RM 23.

(Hilo High special education teacher), and the IEP team.  Rachael was found eligible under the specific learning disability category.[7]

On August 17, 2005, a meeting was held to develop an IEP for Rachael.  The parents requested and were given a draft IEP prior to the meeting. Decision, ARA Doc. # 14 at 167.  The parents and a family friend attended the meeting, along with Ferreira and the IEP team.  At the meeting, the IEP team went through each of the IEP's sections and Rachael's placement, and within a few days, tendered its offer of FAPE to the parents.  *Id.*  In drafting the IEP, the team considered the information and data received from Brehm through Rachael's mother.  *Id.*  The "IEP Meeting Information and Notes" from the August 17 meeting indicate that the parents disagreed with several portions, among others, the lack of ESY, the selection of Special Education (at Hilo High) as the least

---

[7] The "IEP Meeting Information and Notes" from the August 10 meeting indicate that:

> Disabilities considered and found applicable were:  Specific Learning Disability under all areas, except written expression, and including conditions related to dysthymia also Speech/Language Disability, and Emotional Disturbance category.  Team decided that her primary and qualifying disability is in the Specific Learning Disability.  The . . . other disabilities, to which she also qualified for:  Speech/Language Disability and Emotional Disturbance will be addressed in the IEP.

ARA Doc. #16, Petitioners' Exhibits ("PE") at 026.

restrictive environment ("LRE"), and rejection of a Private Residential Facility. ARA Doc. # 15,  PE at 027.

The IEP, to be implemented at Hilo High, included 270 minutes per quarter of counseling, 465 minutes of special education (2.5 times per week), and 540 minutes per quarter of speech/language therapy, but no ESY because Rachael did not meet the standard.  ARA Doc. # 15,  PE at 025.  Under the IEP, Rachael would not participate in English, Math, Social Studies, Science, Health, or Career and Life Planning classes with non-disabled students, but could participate with them in electives and extracurricular activities.  *Id.*

The IEP's section on Rachael's Present Levels of Educational Performance ("PLEP") includes a description of her verbal skills as significantly lower than her performance skills, and indicates that she was weak in areas like reading comprehension and math fluency.  *Id.* at 011-012.  The IEP also states that Rachael was diagnosed in 1997 with a central auditory processing disorder and recommends that she be given preferential seating, including being close to the instructor, with her left ear to the instructor and her right ear to towards any distracting noises.  *Id.* at 013.  The PLEPs note the team's concern regarding Rachael's low verbal skills, which require a small class size and more teacher monitoring.  *Id.*

Also included in the IEP are nine "Annual Goals" and corresponding "Measurable Annual Goals" and "Benchmarks/Short-term Objectives" relating to "Career and Life Skills," "Language Arts" (Reading & Literature and Oral Communication), and "Mathematics" (Number and Operation, and Measurement). *Id.* at 016-024.  The IEP section entitled "Transition Service Needs" does not contain highly detailed responses; specifically, the field for "Student's Interests" is marked "na," (presumably, not applicable).  ARA Doc. # 16, RE at RM24.  Jodi Ferreira testified that the transition plan would need to be modified during the first semester of the school year because Rachael was not available to interview for transition services and the transition services coordinator is a nine-month position, so the IEP would incorporate the transition plan that was provided by Brehm. Transcript ("Tr."), Vol. II at 18-20.

On August 23, 2005, the parents wrote to Hilo High School Principal Robert Dircks that they were rejecting the placement proposal of the IEP team and advised that they intended to place Rachael at Brehm at public expense.  ARA Doc. # 15, PE at 056.

## 2. The Proceedings Below

On September 7, 2005, Plaintiffs filed a Request for Due Process Hearing, alleging that the DOE had violated the IDEA by failing to provide her

11

with a FAPE.  Decision, ARA Doc. # 14 at 165.  The DOE filed a motion to

dismiss with regard to all prior school years (2002-2003, 2003-2004 and 2004-

2005) on October 10, 2005.  A hearing was held on November 18, 2005.  On

November 30, 2005, Administrative Hearings Officer Haunani H. Alm granted

DOE's motion to dismiss with regard to Plaintiff's request for reimbursement for

the 2002-2003, 2003-2004 and 2004-2005 school years.  Order, ARA Doc. # 14 at

110-11.

Hearings Officer Craig H. Uyehara heard two days of testimony on

December 6 and 7, 2005.  Testifying at the hearing were Rachael's mother, Todd

Bowen and Terri Clough (representatives of Brehm), Plaintiffs' expert Dr. Barbara

Bateman, and Jodi Ferreira.  On January 30, 2006, the Hearings Officer issued his

Decision, dismissing the due process hearing request and concluding that the

parents had failed to prove by a preponderance of the evidence that DOE failed to

provide FAPE.

Plaintiffs filed their Complaint with the court on March 2, 2006, and

on September 11, 2006 filed their Opening Brief.  They seek an order reversing

the Hearings Officers' decisions.  The Defendants filed their Answering Brief on

October 11 and Plaintiffs replied on October 25.  The court heard arguments on

November 13, 2006, at which the parties declined to present additional evidence.

## III.  STANDARD OF REVIEW

The IDEA provides that "[a]ny party aggrieved by the findings and decision" of the hearings officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States."  20 U.S.C. § 1415(i)(2)(A).

The IDEA requires the following of the court:

In any action brought under this paragraph, the court--

(i)  shall receive the records of the administrative proceedings;

(ii)  shall hear additional evidence at the request of a party; and

(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

20 U.S.C. § 1415(i)(2)(C).  In *Rowley*, the Supreme Court explained the court's role in reviewing an administrative decision in an IDEA case:

[T]he provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.  The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set

13

state decisions at nought.  The fact that § 1415(e)[8] requires
that the reviewing court "receive the records of the [state]
administrative proceedings" carries with it the implied
requirement that due weight shall be given to these
proceedings. And we find nothing in the Act to suggest that
merely because Congress was rather sketchy in establishing
substantive requirements, as opposed to procedural
requirements for the preparation of an IEP, it intended that
reviewing courts should have a free hand to impose substantive
standards of review which cannot be derived from the Act
itself.  In short, the statutory authorization to grant "such relief
as the court determines is appropriate" cannot be read without
reference to the obligations, largely procedural in nature, which
are imposed upon recipient States by Congress.

458 U.S. at 206-07 (footnotes omitted) (final alteration in original).  *See also City*

*of Chi. v. Int'l College of Surgeons*, 522 U.S. 156, 171 (1997) (citing *Rowley* for

the proposition that the IDEA "contemplates deferential review of state

administrative action").

The Ninth Circuit has clarified the court's role in reviewing a

hearings officer's decision in an IDEA case:

The proposition that the courts must give "due weight"
raises the question of how *much* weight is "due."  We held in
*Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th
Cir.1987), that "[h]ow much deference to give state educational
agencies ... is a matter for the discretion of the courts."
Following a First Circuit decision, we held in *Gregory K.* that
the courts are to consider the findings "carefully and endeavor
to respond to the hearing officer's resolution of each material

---

[8] This provision now appears at 20 U.S.C. § 1415(i).

issue," but the court "is free to accept or reject the findings in part or in whole." *Id.* (*quoting Town of Burlington v. Department of Education*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed.2d 385 (1985)).

When exercising its discretion to determine what weight to give the hearing officer's findings, one criterion we have found useful is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are "thorough and careful." *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir.1994).

*Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (alterations in original).

Thus, judicial review of IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review. *Ojai*, 4 F.3d at 1471. The IDEA does not empower a court to substitute its own notion of sound educational policy for that of the school authorities that the court reviews. *County of San Diego*, 93 F.3d at 1466; *Ojai*, 4 F.3d at 1472; *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). In recognition of the expertise of the administrative agency, the court must consider the findings carefully and endeavor to respond to the hearings officer's resolution of each material issue. After such consideration, the court is free to accept or reject the finding in whole or in part. *County of San Diego*, 93 F.3d at 1466; *Gregory K.*,

15

811 F.2d at 1311.  Despite its discretion to reject the administrative findings after

carefully considering them, a court is not permitted simply to ignore the

administrative findings.  *County of San Diego*, 93 F.3d at 1466; *Gregory K.*, 811

F.2d at 1311.

The burden in this proceeding is on the Plaintiffs, the party

challenging the administrative ruling.  *Seattle Sch. Dist., No. 1 v. B.S.*, 82 F.3d

1493, 1498 (9th Cir. 1996) ("As the party challenging the administrative ruling,

the School District . . . had the burden of proof in district court.").

## IV.  ANALYSIS

The Plaintiffs present four arguments.  First, they argue that material

procedural violations of the IDEA require reversal of the Decision.  Second,

Plaintiffs claim that the DOE's failure to offer Rachel ESY in the summer of 2005

was a denial of FAPE.  Next, they assert that the DOE substantively denied FAPE.

Finally, Plaintiffs seek reversal of the Hearings Officer's dismissal of their 2003-

2004 and 2004-2005 school year reimbursement claims, based on retroactive

application of Hawaii Revised Statutes ("HRS") § 302A-443.

As an initial matter, the court finds that the Hearings Officer's

January 30, 2006 Decision is sufficiently thoughtful, both in its factual findings

and legal analysis.  The Decision examines Rachael's educational history,

applying the IDEA and relevant caselaw in a reasoned manner.  The Decision

addresses Plaintiffs' arguments and considers (albeit often in footnotes) evidence

proffered by the parents and their experts.  The court, in its discretion, accords

appropriate weight to the Hearings Officer's January 30, 2006 Decision.

Furthermore, the court has conducted an independent review of the record and

agrees with the Hearings Officer's factual findings.

A.      Material Procedural Violations of the IDEA

             The parents allege multiple procedural violations of the IDEA,

including:  (1) the lack of measurable goals and objectives based on inaccurate

PLEPs in 2005; (2) the lack of a transition plan;[9] and (3) the predetermination of

placement.  The court addresses each argument in turn.[10]

---

[9] At the hearing, Plaintiffs' counsel clarified that the allegedly deficient transition plan
was both a stand-alone basis for the motion, as well as evidence supporting their argument that
placement at Hilo High was predetermined.

[10] Plaintiffs also argue that the parents were denied meaningful participation in the
development of the IEP and that representatives from Brehm were necessary members of the IEP
team.  The court rejects both of these claims.  The evidence shows the parents were active
participants in the IEP process throughout the summer of 2005.  At least one parent attended all
of the meetings and meeting notes indicate that the parents raised objections to the IEP.  With
regard to the lack of Brehm representation on the IEP team, there is no statutory requirement that
a teacher from the current school be part of the team.  Further, the record shows that Rachael's
2004 IEP from Brehm was considered in forming the IEP in issue, as well as her assessments
done by Brehm teachers.  *See, e.g., Cone v. Randolph County Sch.*, 302 F. Supp. 2d 500
(M.D.N.C. 2004) (holding that district's failure to include representatives from private school or
state mental health department on IEP team was not a material procedural violation of the IDEA;
neither party's presence was statutorily required, the representatives could have been invited by
                                                                              (continued...)

## 1.   The IEP did not lack measurable goals and objectives

Plaintiffs argue vigorously that the IEP's PLEPs are deficient and that

the IEP lacked measurable goals and objectives.  The IDEA requires, with respect

to PLEPs and goals, that the IEP include:

> (I)   A statement of the child's present levels of academic
>        achievement and functional performance, including --
>        (aa)   how the child's disability affects the child's
>               involvement and progress in the general education
>               curriculum;
>                          * * *
> (II)  a statement of measurable annual goals, including
>        academic and functional goals, designed to --
>        (aa)   meet the child's needs that result from the child's
>               disability to enable the child to be involved in and
>               make progress in the general education
>               curriculum; and
>        (bb)   meet each of the child's other educational needs
>               that result from the child's disability;
> (III) a description of how the child's progress toward meeting
>        the annual goals described in subclause (II) will be
>        measured and when periodic reports on the progress the
>        child is making toward meeting the annual goals (such as
>        through the use of quarterly or other periodic reports,
>        concurrent with the issuance of report cards) will be
>        provided.

20 U.S.C. § 1414(d)(1)(A).  Rachael's IEP, and in particular, the sections entitled

"Present Levels of Educational Performance" and "New Individualized Education

---

[10] (...continued)
the student's parents, and evidence which could have been offered by representatives was
available to the IEP team).

Program Annual Goal," conformed to these requirements.  ARA Doc. # 16, RE at RM 21-RM 23, RM 25-RM 33.[11]

Plaintiffs rely heavily on the testimony of Dr. Barbara Bateman, who asserted that the PLEPs were not sufficient to create meaningful goals and objectives.  Plaintiffs also claim that the PLEPs are internally inconsistent.  For instance, the results of various diagnostics and assessments indicate that Rachael has a *reading comprehension* level of either 2.1 (apparently from the Kaufman assessment) or fifth grade (according to Brehm teacher), and *reading fluency* at a sixth grade level (from Gray Oral Reading Test).  ARA Doc. #16, RE at RM 22-RM 24, RM 47.  According to Ferreira, these inconsistencies were not problematic; she said "[i]f you don't use the same test on two separate testing

---

[11] Similarly, Hawaii Administrative Rule ("HAR") § 8-56-38 requires the IEP to include:

> (1)   A statement of the student's present levels of educational performance, including:
>
> > (A)   How the student's disability affects the student's involvement and progress in the general curriculum;
> > * * *
>
> (2)   A statement of measurable annual goals, including benchmarks or short-term objectives related to:
>
> > (A)   Meeting the student's needs that result from the student's disability to enable the student to be involved in and progress in the general curriculum, . . . and
> > (B)   Meeting each of the student's other educational needs that result from the student's disability[.]

occasions, you cannot really compare the scores, but you can look for trends." Tr. Vol. II at 28.

Ferreira testified that the IEP team did discuss this conflict, "and they felt the fifth grade level comprehension was more an accurate indicator of her present level of educational performance." Tr. Vol. II at 31. She acknowledges, however, that the PLEP itself does not say that the team considered the issue and decided to use the fifth grade level as opposed to the 2.1 level. *Id.* The PLEP *does* state that the "scores from April 2004 through March 2005 are not consistent from assessment to assessment. However, data does identify areas of strengths and weaknesses." ARA Doc. # 16, RE at RM 21. The PLEP further explains that "[c]ontent reading should begin at the 5th grade, which she is reportedly comfortable with and generally increased in difficulty, yet still be manageable for her." *Id.* at RM 22. The court concludes that the IEP sufficiently accounts for any inconsistencies such that the PLEPs are not rendered procedurally deficient.

The IEP includes the required statement of Rachael's present levels of academic achievement and functional performance and how her disability affects her involvement in the general education curriculum. The PLEPs section adequately catalogs her present levels of educational performance, including the results of her academic and social assessments, and her educational performance at

Brehm.  Her PLEPs indicate that her verbal skills are low, and also include

specific references to her problems with passage comprehension and math fluency.

*See* ARA Doc. # 16, RE at RM 21.  Her disability affects her involvement in the

general educational curriculum because "reading affects all content areas," and

therefore, "she may need more supports/accommodations from the special

educational setting."  *Id.* at RM 21-RM 22.  The section notes that "Rachael's low

verbal skills prevent academic progress in the regular program.  Her need for

reading comprehension skills, math skills, . . . and her difficulty with verbal tasks

[require] a smaller class size that provides more teacher monitoring for

understanding and differentiation in learning/teaching strategies."  *Id*. at RM 23.

The PLEPs also address Rachael's central auditory processing disorder and

corresponding accommodations.  *Id.*  The PLEPs portion of the IEP includes the

elements required under 20 U.S.C. § 1414(d)(1)(A)(i)(I).

Each "Annual Goal" page in Rachael's IEP contains sections entitled

"Measurable Annual Goal" and "Benchmarks/Short-term Objectives."  Dr.

Bateman opined that the IEP "was just so full of generalities that you know

nobody ever plans to measure it.  They never planned to measure it because they

can't." Tr. Vol. I at 191.  She also challenged the stated goals, testifying that "it is

very questionable to say 80 percent accuracy is sufficient," "I don't think one out

of five wrong is ok," and "it is kind of odd to want her to do this in only two out of three assignments.  Why not three out of three?"  Tr. Vol. I at 198, 197, 193.  The court has reviewed the testimony in the record and the relevant portions of the IEP and rejects the Plaintiffs' claim that the goals are immeasurable.  The goals and benchmarks are specific, capable of measurement and directly relate to Rachael's areas of weakness identified in the PLEPs.[12]

Plaintiffs also rely on *Escambia County Board of Education v. Benton*, 406 F. Supp. 2d 1248 (S.D. Ala. 2005).  The defects in *Escambia*, however, went well beyond those alleged in the current IEP.  For instance, in *Escambia* there was no indication from year-to-year whether the student had made progress on the previous year's benchmarks and some data was missing entirely.  Further, the school district "acknowledged problems with the IEPs for [the student], such as *absence* of dates of mastery of benchmarks*, lack of any record* of [the student's] progress and achievement, *omission of measurable annual goals*, and failure to describe special education services with specificity."  *Id.* at 1254

---

[12] The Hearings Officer determined that Bateman's testimony was "speculative and not particularly helpful in determining how the alleged deficiencies amounted to denial of a FAPE . . . [and] that Petitioners' Expert appeared to have no direct knowledge of the Student and her particular needs."  Decision, ARA Doc. # 14, at 175 n.4.  To the extent Dr. Bateman was suggesting that Rachael's measurable goals should be demonstrated by perfection -- that is, the goals should be set at a level where she could master the goals without error -- the court agrees with the Hearings Officer's conclusion.  The IEP sets forth realistic goals with appropriate benchmarks.

(emphasis added).  That is not the case here.  Unlike in *Escambia,* the DOE has

not couched Rachael's annual goals in fuzzy, ambiguous, ill-defined terms that

render it difficult to know what the objectives are, or virtually impossible to

measure whether she has achieved them.  *See id.* at 1275.  The IEP contains

measurable annual goals, including academic and functional goals, in accord with

20 U.S.C. § 1414(d)(1)(A)(i)(II).

Finally, the IEP clearly included the required description of how

Rachael's progress toward meeting the annual goals would be measured and when

periodic reports would be provided.  *See* 20 U.S.C. § 1414(d)(1)(A)(i)(III).[13]  In

sum, the court concludes that the IEP complied with 20 U.S.C. § 1414(d)(1)(A)(i),

the IDEA's requirements with respect to the PLEPs, goals and objectives.

## 2.    The transition plan

Since Rachael was sixteen at the time, her IEP was required to

include  "transition services" necessary for reaching appropriate post-secondary

goals.  20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  "Transition services" are defined in 20

U.S.C. § 1401(34):

---

[13] Each annual goal indicates that "[p]rogress on the goals will be reported at the end of each quarter/trimester unless otherwise noted."  ARA Doc. # 16, RE at RM 25-RM 33.  And a section in each "Annual Goal" indicates how progress toward the goal will be measured:  by "observation and records," "daily work," or a combination of both.  *See id.*

The term "transition services" means a coordinated set of activities for a child with a disability that--

(A) is designed to be within a results-oriented process, that is focused on improving the academic and functional achievement of the child with a disability to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

(B) *is based on the individual child's needs, taking into account the child's strengths, preferences, and interests*; and

(C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

(Emphasis added.)  The court has reviewed the transition plan and finds that it is not a model statement of services needed.  The section was incomplete, and oddly, the field for "Student's Interests" is marked "na."  ARA Doc. # 16, RE at RM24.

Also of concern is the failure to account for Rachael's particular goals and interests.  This transition plan is a generic and somewhat vague formula of post-high school goals and services, equally applicable to almost any high school student.  For instance, one goal is:  "Competitive employment following graduation, Employment following Post-Secondary Education;" the corresponding transition service is:  "Rachael will focus on a course of study which will lead to

graduation with a High School Diploma." ARA Doc. # 16, RE at RM24.   Rachael

was not interviewed for this specific transition plan, and the record does not reflect

that her parents were consulted on the transition plan.   On the other hand, the

transition plan appears to have been borrowed from Rachael's 2004 Brehm IEP,

which is some evidence of the DOE's effort to individualize her services.   On

balance, the court concludes that the transition plan is not based on the individual

child's needs, and does not take into account her strengths, preferences, and

interests.   The DOE did not comply with the procedural requirements of the

IDEA.[14]

In the Ninth Circuit, procedural violations of the IDEA are subject to

harmless error review.   *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 651-52 (9th

Cir. 2005) (Gould, J., concurring in part and concurring in the judgment); *id.* at

650 n.9 ("[A] majority of the panel has adopted a harmless error test.").   The court

---

[14] The fact that the DOE apparently made no effort to complete the transition plan is
troubling.  The Plaintiffs assert that Rachael was available for an interview regarding the
transition services and Defendants have not set forth any evidence to the contrary.  The DOE
responds that the Transition Coordinator position is a nine-month position and that person was
not available to interview Rachael during the summer.  Jodi Ferreira testified that the transition
plan would need to be modified after Rachael consulted with the Transition Coordinator during
the first semester of the school year.  Tr. Vol. II at 18-20.  The meeting notes from August 17,
2005 also state that a "more comprehensive transition will be conducted during the school year
by the Transition Coordinator and the IEP will be updated.  Parents will be sent a copy of the
updated transition.  Current transition was taken from the IEP made available to HHS from
Brehm." ARA Doc. #15, PE at 027.  Although the transition plan could later be modified, the
court is not impressed by the DOE's lack of diligence in preparing this portion of Rachael's IEP.

assesses the "school district's error for harmlessness . . . by considering whether the procedural error resulted in a loss of educational opportunity or significantly restricted parental participation in the IEP formation." *Id*. at 651-52.

Plaintiffs assert that because Rachael was entering 10th grade and would need college counseling services in the next few years, the transition plan was of great importance.[15]  The court is not persuaded, however.  If Rachael were entering 11th or 12th grade the court would be more sympathetic to this argument.  The transition plan is clearly an important statement of a student's post-secondary objectives, but it assumes greater importance as the student nears graduation and post-secondary life.  The court, therefore, will not place undue weight on the role or significance of the transition plan in Rachael's IEP.

The transition plan's generic goals of high school graduation, attendance at a university or community college, and employment in the community provide a basic framework sufficient to ensure that Rachael would receive transition services that benefit her education.  There is no doubt that Rachael would receive educational benefits from the transition services provided.  Under the plan, she would get assistance with the college planning process and opportunities to explore career options, which are clearly educational benefits.

---

[15] Although Rachael was sixteen years old at the time, she was entering 10th grade because she was retained while at Malamalama.

The court concludes that -- even though the plan was not individualized -- the error was harmless because the IEP would not result in a loss of educational opportunity.  Therefore, the transition plan, while procedurally deficient, did not result in a denial of a FAPE.

### 3.    Rachael's placement at Hilo High was not predetermined

Plaintiffs next argue that the DOE's "predetermination" of placement at Hilo High was not based on Rachael's IEP and resulted in a denial of a FAPE.[16] According to the parents, this was due to DOE's failure to have a transition plan and failure to consider the inappropriateness of Hilo High.[17]

With respect to the transition plan, Dr. Bateman testified that the IEP must be finished before the placement can be discussed because the placement has to be based on the completed IEP.  Tr. Vol. I at 203.  First, the lack of a comprehensive transition plan itself does not prove that the DOE had predetermined that Rachael would be placed at Hilo High.  Second, as discussed in

---

[16] The IDEA's procedural requirements are violated when a school district resolves to educate a child at a particular school, "and then develop[s] an IEP to carry out [its] decision." *Spielberg v. Henrico County Public Schs.*, 853 F.2d 256, 259 (4th Cir. 1988).

[17] Plaintiffs allege that the predetermination is also demonstrated by the DOE's preparation of a draft IEP placing Rachael at Hilo High.  This argument lacks merit.  The August 17, 2005 IEP notes clearly reflect that "[p]arents requested a DRAFT of the IEP be prepared prior to the meeting."  ARA Doc. # 16, RE at RM 37.  The parents cannot request a draft and then complain when it is prepared.

the previous section, the court concludes that the transition plan was deficient, but that the error was harmless.

Just because the DOE believed (and Rachael's parents did not believe) that Hilo High School could provide the services of the IEP does not indicate that Rachael's placement was "predetermined." Rachael's mother asserts that "the vast majority of the people at the meeting seemed to think that Hilo High School could provide the best care for her. They felt that they could give her an appropriate education." Tr. Vol. I at 41. When asked if she believed that this determination was made before the IEP meeting even started, Mother replied, "Probably. I would be inclined to say yes." *Id.* This subjective belief does not amount to predetermination of placement. That a draft IEP was given to the Plaintiffs before the meeting, especially when they requested a draft, does not prove that Rachael's placement was "predetermined" before the IEP was completed. The Ninth Circuit rejected a similar argument by parents claiming that evidence that the IEP team came "with a 'prepared' IEP, shows that the [district] had arrived at a predetermined placement to be implemented without parental input." *Ms. S. ex rel. G. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1132 (9th Cir. 2003), *superseded on other grounds by* 20 U.S.C. 1414(d)(1)(b).

Mother testified that the parents told the IEP team that they "felt that what was being offered at Hilo High would not give our daughter an education," and "[w]e think that a private residential facility would be appropriate for Rachel." Tr. Vol. I at 41, 45.  The DOE, therefore, "knew that [the parents] were requesting a private residential facility, and that facility was Brehm Preparatory Academy[.]" Tr. Vol. I at 46.  It logically follows that the IEP team necessarily considered an alternative set forth by the parents (namely, Brehm), yet decided that Hilo High was an appropriate placement.  The record clearly demonstrates that the DOE did consider the appropriateness of Hilo High, contrary to Plaintiffs' assertion.  The final IEP offered a FAPE based on services available at Hilo High.  Rachael's placement at Hilo High simply reflects a "difference of educational philosophy with [the parents], not a denial of opportunity to participate.  School districts have expertise in educational methods that may be given appropriate weight in assessing an IEP's compliance with the IDEA." *Vashon Island Sch. Dist.*, 337 F.3d at 1133.  No procedural violation resulted from any "predetermination" of placement and there was no corresponding denial of a FAPE.

In sum, the court concludes that the procedural deficiencies alleged by Plaintiffs did not result in a denial of a FAPE.

B.    Lack of ESY Was Not a Denial of FAPE

Plaintiffs assert that Rachael was wrongly denied ESY services during the summer of 2005.  The court disagrees, finding that Plaintiffs have failed to meet their burden.

"Extended school year (ESY) services are required for some students because they require year-round educational or developmental assistance."  *Adams v. Oregon*, 195 F.3d 1141, 1150 (9th Cir. 1999).  ESY services "must be provided *only if* a child's IEP team determines, on an individual basis, . . . that the services are necessary for the provision of FAPE to the child."  34 C.F.R. § 300.309(a)(2) (2005) (emphasis added).[18]  Further, providing an ESY "is the exception and not the rule under the regulatory scheme."  *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990).

The IDEA and the United States Department of Education do not specify standards for states to use in determining whether disabled children should receive ESY, but do provide some criteria for consideration.  *Todd v. Duneland*

---

[18] The text of the current provision effective October 13, 2006 (34 C.F.R. § 300.106(a)(2)), is identical to the version that was effective through October 12, 2006, as well as the prior version, (34 C.F.R. § 300.309(a)(2)), effective through July 1, 2005.

*Sch. Corp.*, 299 F.3d 899, 906 (7th Cir. 2002) (*citing* 64 Fed. Reg. 12406, 12576

(Mar. 12, 1999).[19]  *Todd* explains the applicable considerations:

---

[19] HAR § 8-56-40 states that:

   (a) As used in this section, the term "extended school year services"
means special education and related services:
        (1) Are provided to a student with a disability:
            (A) Beyond the normal school year of the school the
student attends or will attend;
            (B) In accordance with the student's IEP; and
            (C) At no cost to the parent of the student; and
        (2)  Meet the standards of the department.
   (b)  The department shall ensure that extended school year services are
available as necessary to provide a free appropriate public education,
consistent with subsection (c).
   (c) Extended school year services shall be provided only if the student's
IEP team determines, on an individual basis, in accordance with sections
8-56-30 to 8-56-42, that the services are necessary for the provision of a
free appropriate public education to the student.
   (d) The IEP team shall consider factors that include the following in
determining whether a student with a disability needs extended school year
services:
        (1) The nature of the student's disabling condition;
        (2) The severity of the disabling condition;
        (3) The areas of learning crucial to attaining the goal of
self-sufficiency and independence from caretakers;
        (4) The extent of regression caused by the interruption of
educational programming; and
        (5) The rate of recoupment following interruption of educational
programming.
   (e) In implementing the requirements of this section, the department may
not:
        (1)  Limit extended school year services to particular categories of
disability; or
        (2)  Unilaterally limit the type, amount, or duration of those
services.

Based on the court's review of the record, the IEP team considered the factors set out in
§ 8-56-40(d) and determined that the evidence did not support ESY.  *See* Tr. Vol. II at 13.

31

> the states should consider the likelihood of regression, slow
> recoupment, and predictive data based upon the opinion of
> professionals.  Further, the determination of whether an
> individual disabled child needs [extended school year] services
> must be made by the participants on the child's IEP team.  In
> most cases, a multi-factored determination would be
> appropriate, but for some children, it may be appropriate to
> make the determination of whether the child is eligible for
> [extended school year] services based only on one criterion or
> factor."

*Id.* (Citations and quotation signals omitted.) (Brackets in original.)  It appears that

the Ninth Circuit has not yet adopted a standard for determining when ESY

services are appropriate under the IDEA.  Several circuits, including the Fourth,

use the "significant jeopardy" (or regression-recoupment) standard for determining

when ESY is appropriate.  "ESY Services are only necessary to a FAPE when the

benefits a disabled child gains during a regular school year will be significantly

jeopardized if he [or she] is not provided with an educational program during the

summer months."  *MM v. Sch. Dist. of Greenville County*, 303 F.3d 523, 537-38

(4th Cir. 2002).[20]

---

[20] Other circuits "have upheld school district policies using variations of the significant jeopardy/regression recoupment standard ('significant jeopardy standard')."  *McQueen v. Colo. Springs Sch. Dist. No. 11*, 419 F. Supp. 2d 1303, 1308 (D. Colo. 2006).  They include, the Sixth Circuit, *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990) and the Fifth Circuit, *Alamo Heights Independent School District v. State Board of Education*, 790 F.2d 1153, 1158 (5th Cir. 1986). *Id.*  "There is little question that the significant jeopardy standard applies in jurisdictions throughout the country as a basis for determining when ESY services are needed, without violating the IDEA."  *Id.*

Questions of ESY eligibility criteria and methodology are classic examples of technical questions of educational policy. *See Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1305 (9th Cir. 1992); *Rowley*, 458 U.S. at 208 (cautioning that courts lack expertise necessary to resolve "persistent and difficult questions of educational policy") (*quoting San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)).  The court will not second-guess the IEP team's conclusion that Rachael did not meet the ESY standard, absent contrary evidence.

At the August 17 IEP meeting, Hilo High's IEP team concluded that Rachael was not currently eligible for ESY, but would be reevaluated later. According to Ferreira, the school told the parents that "during the first semester, we could collect data, and when we came back after the Christmas break, we could see if the data supported ESY due to regression or [recoupment] issues."  Tr. Vol. II at 13.

The burden is on the parents to establish that ESY services are necessary. *See Kenton County Sch. Dist. v. Hunt*,  384 F.3d 269, 279 (6th Cir. 2004) (holding that parents seeking ESY bore the burden of proof with respect to necessity of ESY to avoid something more than adequately recoupable regression and to permit student to benefit from instruction).  The parents, other than

33

claiming Rachael has "associated mental health issues and memory problems," Plaintiff's Opening Brief at 32, have provided the court with no facts to support their claims that Rachael was entitled to ESY.  As a result, they have not met their burden, and the denial of ESY services was not a denial of FAPE.

C.      Rachael Was Not Denied a FAPE

        Because the court rejects Plaintiffs' procedural challenges and concludes there was no denial of a FAPE under the first prong of *Rowley*, the court next considers whether Rachael's IEP is reasonably calculated to enable her to receive educational benefits.  The court concludes that it is.

        Rachael's IEP provides for personalized instruction, with programs constructed around her particular needs including 270 minutes per quarter of counseling and 540 minutes per quarter of speech and language therapy.  ARA Doc. # 15,  PE at 025.  With regard to Rachael's comprehension issues and central auditory processing disorder, the IEP addressed Rachael's need for a small class size and more teacher monitoring.  Ferreira explained that Rachael would be in special education classes for the core content areas "because of her need for small class size, differentiated instruction, teacher checking for understanding," and that the average is about ten students per class.  Tr. Vol. II at 16.  The court concludes that "personalized instruction is being provided with sufficient supportive services

to permit [Rachael] to benefit from the instruction," and Rachael therefore "is receiving a 'free appropriate public education' as defined by the Act." *Rowley*, 458 U.S. at 189.

The IDEA relies heavily upon the expertise of school districts to meet its goals. *Schaffer*, 546 U.S. at 536. And the court will not substitute its own judgment of sound educational policy for that of the educational authorities. *County of San Diego*, 93 F.3d at 1466. Although the Plaintiffs are not satisfied with the DOE's offer of FAPE, an IEP need not conform to a parent's wishes in order to be sufficient or appropriate. *See Shaw v. District of Columbia*, 238 F. Supp. 2d 127, 139 (D.D.C. 2002) (stating that the IDEA does not provide for an "education . . . designed according to the parent's desires") (*citing Rowley*, 458 U.S. at 207). The court concludes that IEP is reasonably calculated to enable Rachael to receive educational benefits.

D.   The Hearings Officer's Dismissal of Plaintiff's Claims for the 2003-2004 and 2004-2005 School Years

Plaintiffs argue that the Hearings Officer incorrectly dismissed their claims for reimbursement for 2003-2004 and 2004-2005 and that the DOE should have done IEPs during these years. The court agrees that Plaintiffs' reimbursement claims were improperly dismissed and remands to the Hearings Officer for a determination on the merits.

35

### 1.    Reimbursement for 2003-2004 and 2004-2005

On November 30, 2005, Hearings Officer Haunani Alm dismissed

Plaintiffs' request for reimbursement for unilateral special education placement for

the 2003-2004 and 2004-2005 school years.  The Order does not provide any

explanation for the dismissal.  Based on the arguments set forth in Defendant's

Motion to Dismiss and Plaintiffs' Memorandum in Opposition, it is clear that the

ninety-day statute of limitations imposed by Act 158 of the 2005 Legislature

served as the basis for the motion and Order.[21]

---

[21]  The Act, effective June 24, 2005, amended HRS § 302A-443, which now provides in pertinent part:

> (a) An impartial hearing may be requested by any parent or guardian of a child with a disability, or by the department, on any matter relating to the identification, evaluation, program, or placement of a child with a disability; *provided that the hearing is requested*:
>
> (1) Within two years of the date the parent, guardian, or department knew or should have known about the alleged action that formed the basis of the request for a hearing; and
>
> (2) Notwithstanding paragraph (1), *within ninety days of a unilateral special education placement, where the request is for reimbursement of the costs of the placement*.

(Emphasis added.)  Prior to June 24, 2005, a parent had two years in which to file a request for impartial hearing to seek reimbursement of private school tuition.  *See* 20 U.S.C. § 1415(f)(3)(c) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.").  Plaintiffs do not seek reimbursement for the 2002-2003 school year based on the two-year statute of limitations.

36

The IDEA requires the DOE to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education[.]" 20 U.S.C. § 1415(a).  Based on the IDEA and various Hawaii regulations, United States District Court Judge David Alan Ezra concluded that the DOE could not invoke HRS § 302A-443 to shorten the limitations period (from two years to ninety days) absent actual notice to a student's parents.  *See Jaren L., by and through his mother, Shanelle L. v. Dep't of Educ., State of Hawaii*, Civ. No. 06-00024  DAE-LEK (D. Haw. May 1, 2006) (Doc. No. 18).  The court agrees with Judge Ezra's analysis and conclusion.  *See Blake C., by and through his mother, Tina F. v. Dep't of Educ., State of Hawaii*, Civ. No. 06-00335 JMS-KSC (D. Haw. Sept. 12, 2006) (Doc. No. 16).  Consequently, Plaintiffs had ninety days from the date on which they received actual notice of the limitations period in which to request an impartial hearing for their tuition reimbursement claim.  Plaintiffs filed their request on September 7, 2005, within the ninety days imposed by Act 158 on June 24, 2005.  Plaintiffs' filing was therefore timely.

Because Plaintiffs filed within the applicable time period, the Hearings Officer's November 30, 2005 Order dismissing Plaintiffs' request for reimbursement is REVERSED and REMANDED to the Hearings Officer.

## 2.    The failure to hold an IEP meeting from 2002 to 2005

The Hearings Officer apparently did not consider whether the DOE

had developed IEPs for Rachael during 2003-2004 and 2004-2005 or the effect of

any failure to do so.  The DOE is required to have IEPs in effect for all students

with disabilities within its jurisdiction.  *See* 20 U.S.C. § 1414(d)(2)(A) ("At the

beginning of each school year, each local educational agency . . . shall have in

effect, for each child with a disability in its jurisdiction, an individualized

education program. . . .").  Further, the IEP is to be reviewed, and if necessary

revised, "not less frequently than annually."  20 U.S.C. § 1414(d)(4)(A).

The court has little evidence on which to base a ruling on the issue.

Plaintiffs maintain that no annual IEP meetings or evaluations were conducted

after 2001 (when they rejected DOE's offer of FAPE and unilaterally placed

Rachael at Malamalama), and that IEPs should have been developed during the

following school years.[22]   The Defendants have not squarely addressed Plaintiffs'

claim, nor do they set forth any evidence of having complied with the IDEA's

requirements between 2002 and 2005.  There is little evidence before the court on

---

[22] It is unclear whether Plaintiffs contend that the DOE's failure to have IEPs during those years renders the 2005 IEP defective or whether it constitutes a stand-alone IDEA violation which entitles them to relief.  To the extent Plaintiffs argue that the lack of previous IEPs invalidates the 2005 IEP, the court rejects the claim.  Any lack of an IEP or annual review during these years is harmless with respect to the 2005 IEP because the IEP team relied on Rachael's 2004-2005 IEP from Brehm.

this issue and the court will not consider this issue in the first instance.  The issues of whether the DOE failed to develop IEPs during the previous schools years and whether such failure independently violated the IDEA is therefore REMANDED to the Hearings Officer.

## V.  CONCLUSION

Based on the foregoing, the court AFFIRMS the Hearings Officer's Decision issued on January 30, 2006.  The court also REVERSES and REMANDS to the Hearings Officer the November 30, 2005 Order dismissing Plaintiffs' request for reimbursement for the 2003-2004 and 2004-2005 school years and REMANDS to the Hearings Officer the Plaintiffs' related claim regarding the alleged failure of the DOE to complete IEPs for the previous school years.

The Clerk of the Court is directed to close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, January 8, 2007.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Virginia S. et al. v. DOE*, Civ. No. 06-00128 JMS/LEK, Order Affirming in Part and Reversing and Remanding in Part Administrative Hearing Decision